UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELIZABETH WOODARD,

                              Plaintiff,

        -v-

MONTICELLO CENTRAL SCHOOL DISTRICT,
RICHARD FELLER, JACOB BILLIG, SUSAN
HORTON, VIVIAN LIFF, EUGENE NESIN,
ALYCE VAN ETTEN, JOHN PAVESE, ROBERT
ROSENGARD, ROBERT STEWART, and EILEEN
P. CASEY,

                              Defendants.

Case No. 06-CV-13361 (KMK)

<u>OPINION AND ORDER</u>

<u>Appearances:</u>

Craig M. Bonnist, Esq.
Bonnist & Cutro, LLP
Rye Brook, NY
*Counsel for Plaintiff*

Gregg Tyler Johnson, Esq.
Jacinda Hall Conboy, Esq.
Girvin & Ferlazzo, P.C.
Albany, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Elizabeth Woodard brings this action alleging race discrimination in connection

with her termination as a high school teacher employed by the Monticello Central School

District (the "District").  Plaintiff, who is African-American, seeks relief against the District, its

former superintendent, and current and former members of its board of education (collectively,

"Defendants"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

("Title VII"), and 42 U.S.C. §§ 1981, 1983, and 1985.[1]  Plaintiff's First Amended Complaint

("Amended Complaint") seeks "front pay, back pay, compensatory damages, compensation for

mental anguish, punitive damages, reinstatement, disbursements, costs, reasonable attorneys'

fees, and pre-judgment interest."  (First Am. Compl. ("AC") 1.)  Defendants move for summary

judgment.  For the reasons stated herein, Defendants' Motion is granted.

I. Background

A.  Facts[2]

1.  Plaintiff's Hiring

Plaintiff was hired by the District's Board of Education (the "Board") in 2002 upon the

recommendation of Defendant Eileen P. Casey ("Casey"), then the superintendent of schools for

the District.  (Defs.' Local Rule 56.1 Statement ("Defs.' Rule 56.1") ¶ 1.)  Casey was acquainted

with Plaintiff prior to 2002, as Casey had served as superintendent for the District since 1993

(Aff. of Eileen Casey in Supp. of Defs.' Mot. for Summ. J. ("Casey Aff.") ¶ 1), and Plaintiff had

---

[1] Plaintiff also alleged violations of Section 296 of the New York State Human Rights Law, but these claims were dismissed by Judge Colleen McMahon, to whom this case was originally assigned, for failure to file a timely notice of claim.  (Mem. Order Granting in Part and Denying in Part Defs.' Mot. to Dismiss the Compl., filed Aug. 10, 2007.)

[2] On a motion for summary judgment, the Court inquires whether any material facts are legitimately in dispute.  Pursuant to Local Civil Rule 56.1(a), Defendants properly submitted a statement of the material facts they contend to be undisputed.  In opposition to Defendants' motion, Plaintiff submitted an affidavit in response to Defendants' Rule 56.1(a) statement, but the affidavit did not comply with the requirements of Rule 56.1(d), which require a party opposing summary judgment to follow each of her statements with "citation to evidence which would be admissible."  Plaintiff's affidavit contained no citations to the record.  Accordingly, the Court's synthesis of the facts does not rely on the assertions in Plaintiff's affidavit, as "statements in an affidavit filed in response to a summary judgment motion c[an] not create material factual disputes where none existed without such affidavit," *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).  It bears noting, however, that the Court would grant summary judgment even if it considered Plaintiff's affidavit.

2

been a parent of a District student and a substitute teacher for the District (Aff. of Craig M. Bonnist in Opp'n to Defs.' Mot. for Summ. J. ("Bonnist Aff.") Ex. 2 (Deposition of Eileen Casey ("Casey Dep.") 9)).  Upon the recommendation of Monticello High School ("MHS") principal William Stickney ("Stickney"), Casey interviewed Plaintiff and recommended to the Board that Plaintiff be hired.  (*Id.* 17-18; Casey Aff. ¶ 2.)  At the time, Casey knew that Plaintiff was African-American.  (Defs.' Rule 56.1 ¶ 32.)  The Board appointed Plaintiff to a two-year probationary term as a business teacher at MHS.[3]  (*Id.* ¶ 2; AC ¶ 22.)  Plaintiff was assigned to teach Accounting, Introduction to Occupations, and Keyboarding.  (Casey Dep. 19.)

### 2.  Plaintiff's 2002-03 Evaluations

Over the course of the 2002-03 school year, Plaintiff was evaluated several times by supervisors.  In September 2002, Assistant Principal Janine Carpenter ("Carpenter") evaluated Plaintiff's instruction of a Keyboarding class, and in her report praised Plaintiff for her "clearly visible" "efforts to build [students'] confidence" and her "excellent" keyboarding lesson. (Bonnist Aff. Ex. 3 (Sept. 13, 2002 Evaluation, Pl.'s Personnel File).)

In October 2002, Carpenter evaluated Plaintiff's Introduction to Occupations class, in which Plaintiff delivered a lesson on entrepreneurship.  Carpenter's report stated that Plaintiff "works to personalize her lessons" and "understands that narrative or story is a strong teaching device."  (*Id.* (Oct. 15, 2002 Evaluation, Pl.'s Personnel File).)  However, the report also stated that Plaintiff's definition of "entrepreneur" was unclear, that Plaintiff failed to explicitly connect

---

[3] Because Plaintiff had previously been tenured by another school district in New York, her probationary term was limited by law to a maximum two-year period.  *See* N.Y. Educ. Law § 3014(1) (McKinney 2007).  New York law required the District either to award Plaintiff tenure or to deny her tenure at the completion of that probationary term.  *See id.* § 3014(2).

an example (a dot-com web address) to the definition she offered, that students were frustrated that Plaintiff gave them an ungraded quiz but did not promptly tell them that it would be ungraded, that some students were standing up at the end of the period when homework was assigned and did not leave class with the assignment, that Plaintiff's visual aids were "too small to be effective," that classroom rules were not "explicit and posted," and that the "summarization of the lesson was lost because the students were standing." (*Id.*)

In March and April 2003, Principal Stickney evaluated two of Plaintiff's Keyboarding classes. His first report stated that Plaintiff's students "all knew what was expected of them" and that Plaintiff's lesson was "appropriate," but that students were "not prepared for the end of the period" and thus Plaintiff should "pay attention to this time so that meaningful closure can be given." (*Id.* (Mar. 28, 2003 Evaluation, Pl.'s Personnel File).) His second report stated that Plaintiff "made good use of a computer and projector to model the topics of the day's lessons" and "made a conscious effort to incorporate a summary at the end of the lesson," but that Plaintiff should "make sure all the students are attentive" at the end of the lesson "as some were focused on cleaning up and saving their work." (*Id.* (Apr. 1, 2003 Evaluation, Pl.'s Personnel File).)

Plaintiff's year-end "Summative Evaluation" by Assistant Principal Carpenter stated that Plaintiff "is a positive person who is concerned about the success of her students." (*Id.* (May 28, 2003 Summative Evaluation, Pl.'s Personnel File).) The evaluation stated that Plaintiff was concerned for the "inclusion of students not typically involved in school organizations" and was therefore "developing a Cultural Club and would like to have a fashion show for our students in the near future." (*Id.*) The evaluation recommended that Plaintiff "continue to work to improve

4

her mastery of content subject matter in all areas that she teaches" and present knowledge to students "through assignments that are accurate and meaningful for the [high school] level." (*Id.*)  The evaluation also stated that Plaintiff "must be on time" and must inform the head teacher if she is late, that lesson plans "need to be organized and written to meet the structure of block periods and be consistent in quality," that teaching materials should be "ready to be used for classroom instruction when the period begins," and that Plaintiff should "[m]aintain shared [classroom] space neatly."  (*Id.*)

Casey was informed by "building-level supervisors who directly observed and evaluated Plaintiff" of several perceived deficiencies in Plaintiff's job performance during the 2002-03 school year:  "lack of content knowledge as a business teacher; lack of organization; failure to report to her job on time; failure to notify the head teacher when she was late; inability to provide clear instruction to students; poor lesson plans; lack of planning and preparation for classes; and failure to provide materials to students during class."  (Casey Aff. ¶ 3.)

### 3.  Efforts to Improve Plaintiff's Performance in 2002-03

Carpenter's written evaluation of Plaintiff's October 15, 2002 Introduction to Occupations class indicated that prior to that class period, Plaintiff "expressed that she was having difficulty developing the content subject matter" for the class, which led to a meeting between Plaintiff, Carpenter, and Wendy Levinson, head teacher of the business department. (Bonnist Aff. Ex. 3 (Oct. 15, 2002 Evaluation, Pl.'s Personnel File).)  After the meeting and Carpenter's subsequent observation of Plaintiff's October 15 class, Carpenter recommended that Plaintiff meet with Levinson in a "task force," one day per week for five weeks, "specifically to work on development of lessons that reflect a solid content area knowledge and pedagogical

structure in Introduction to Occupations and Accounting."  (*Id.*; Aff. of Wendy Levinson in Supp. of Defs.' Mot. for Summ. J. ("Levinson Aff.") ¶ 3.)

Levinson met with Plaintiff as recommended, offered Plaintiff lesson plans and materials used by other business teachers, and invited Plaintiff to observe classes taught by herself as well as classes taught by a veteran business teacher, Susan Bahrenburg.  (Levinson Aff. ¶ 4.)  After the conclusion of the five-week period, Levinson continued to assist Plaintiff in reviewing her lessons and exams, spoke with Plaintiff about teaching, and offered to meet with Plaintiff over the summer.  (*Id.* ¶ 5.)  Levinson also asked Bahrenburg to provide assistance to Plaintiff in teaching Accounting.  (Aff. of Susan Bahrenburg in Supp. of Defs.' Mot. for Summ. J. ("Bahrenburg Aff.") ¶ 3.)  Bahrenburg provided Plaintiff with various materials that she had compiled during her years of teaching, and invited Plaintiff to visit her classes.  (*Id.* ¶ 4.)[4]

Prior to the start of the 2003-04 school year, Plaintiff was relieved of teaching Accounting and was assigned to teach only Introduction to Occupations and Keyboarding.  (Levinson Aff. ¶ 9.)  This change was made "in an effort to reduce her work load and preparation time and to increase her opportunity for improvement."  (*Id.*)

### 4. Plaintiff's 2003-04 Evaluations

In September 2003, Principal Stickney evaluated Plaintiff's Introduction to Occupations

---

[4] When questioned during an arbitration hearing, Plaintiff said she did not recall Bahrenburg inviting her to observe her Accounting class, but agreed that Levinson did extend such an invitation.  (Aff. of Jacinda H. Conboy in Supp. of Defs.' Mot. for Summ. J. ("Conboy Aff.") Ex. C (Arbitration Proceedings Tr., dated Nov. 7, 2005 ("Arb. Tr."), 27-28).)  In response to the Defendants' contention, pursuant to Local Rule 56.1, that Levinson offered teaching materials to Plaintiff and suggested that Plaintiff observe Bahrenburg's classes (Defs.' Rule 56.1 ¶ 7), Plaintiff answered "Denied" but did not offer any evidence specifically contradicting Defendants' assertion, instead discussing the extent to which other teachers visited Plaintiff's class (Pl.'s Aff. in Opp'n to Summ. J. ("Pl.'s Aff.") ¶ 7).

class and wrote in his report that Plaintiff "ma[d]e the material relevant to the students by relating it to their everyday experiences," that "students seemed to enjoy the class and were cooperative," and that "students interacted very positively."  (Bonnist Aff. Ex. 3 (Sept. 19, 2003 Evaluation, Pl.'s Personnel File).)  However, Stickney also stated that Plaintiff failed to summarize the lesson at the end of the class, though there was "some class time remaining" and "ample time for a summary."  (*Id.*)

In November 2003, Assistant Principal Carpenter evaluated an Introduction to Occupations class in which Plaintiff taught a lesson on filling out income tax forms by having the class go through a 1040EZ form line by line.  (*Id.* (Nov. 17, 2003 Evaluation, Pl.'s Personnel File).)  According to Carpenter's evaluation, Plaintiff "stated that the W-2 is sent from the Federal Government," and Carpenter "corrected" Plaintiff and "directed the students to the example of a W-2 on a previous page."  (*Id.*)  The evaluation also stated that Plaintiff conducted "[a]n unclear discussion . . . of who is eligible for unemployment and how they determine the amount.  Mrs. Woodard stated, 'if you were making $500, you'd get half of it' and 'you'd get a nice amount.'"  (*Id.*)  According to the evaluation, Plaintiff, after asking students to state the purpose of a Social Security number, "made the statement, 'there is money involved in the SS card,'" which was "confusing to the students," as the funding of the Social Security system is "not part of the 1040EZ process."  (*Id.*)  The evaluation also stated that Plaintiff made references to a booklet related to the tax form, asked students if they brought in the booklet, and suggested that the class would be looking at the booklet; neither Plaintiff nor the students had the booklet, as it was "not available at this time of year."  (*Id.*)  Carpenter's evaluation concluded:  "It appears to me that Mrs. Woodard's knowledge of the concepts, vocabulary, and process [*sic*] of

7

this topic is not well developed, resulting in confusion for students in the room.  While there was

an order of events outlined in her planbook, the lesson did not indicate thorough planning for

content, materials or time usage."  (*Id.*)

In February 2004, Carpenter evaluated Plaintiff's Introduction to Occupations class

again.  Carpenter's report stated that Plaintiff gave students a quiz that they had already taken

(Plaintiff said that she did this "so that they really knew it"), that students did not provide

accurate definitions of any of the vocabulary terms that were the subject of the quiz, and that

later in the class period Plaintiff used visual aids that were not clearly written.  (*Id.* (Feb. 9, 2004

Evaluation, Pl.'s Personnel File).)  The report also stated:  "The inappropriate, rude and

disrespectful behaviors exhibited by some students in this room affected the learning process.

The following behaviors need to be eliminated:  late[nes]s to class, speaking out of turn in a rude

manner, not having materials, and standing up, packing up and speaking to one another while the

teacher was still at the board.  At this point in the year, these issues should be under control."

(*Id.*)

Stickney observed Plaintiff's Introduction to Occupations class in March 2004.

Stickney's report criticized Plaintiff's management of the students' time, stated that Plaintiff

should "clos[e] the door when the noise from the hallway is distracting," recommended that

Plaintiff refrain from "handing out papers and giving instructions to accompany those papers

while the students are working," and noted that, although Plaintiff never made it clear what the

best solution to a particular question was, "the students were repeating what they said as a

summary."  (*Id.* (Mar. 18, 2004 Evaluation, Pl.'s Personnel File).)

Stickney's year-end "Summative Evaluation" of Plaintiff stated that Plaintiff "is a caring

individual whose concern for students has been evident throughout the year," and described Plaintiff as "instrumental" in developing extracurricular student activities.  (*Id.* (Mar. 22, 2004 Summative Evaluation, Pl.'s Personnel File).)  The evaluation stated that "while there were organizational and planning problems" with the "cultural/fashion show" planned by Plaintiff, "the show was well intended and appreciated by the participating students."  (*Id.*)  However, the evaluation also concluded that "adequate progress has not been achieved" on two of Plaintiff's three "Performance Objectives," as "a thorough knowledge of the subject matter has not been demonstrated," and Plaintiff's practice of beginning her class with a quiz that is "followed up with the information on the quiz being taught to the students . . . does not allow for proper assessment of the student[s'] knowledge."  (*Id.*)  Stickney's evaluation also stated that "planning and preparation continues to be a concern," due to "instances where materials were presented in a disorganized fashion and instances where materials were available and were not used."  (*Id.*)

Casey was informed by "administrators who observed and/or evaluated Plaintiff" of several perceived deficiencies in Plaintiff's job performance during the 2003-04 school year: "lack of mastery of the subject area, poorly planned lessons, lack of organization, failure to report to school on time, failure to notify the head teacher and submit lesson plans when Plaintiff was out, and untimeliness."  (Casey Aff. ¶ 6.)

### 5.  Colleagues' Assessments of Plaintiff's Performance

Bahrenburg, who sometimes shared a classroom with Plaintiff, "frequently found the classroom, as well as the desk and materials in the classroom, to be unorganized following [Plaintiff's] teaching periods," as Plaintiff "frequently left papers and materials all over the desk and classroom."  (Bahrenburg Aff. ¶ 6.)  On one occasion, Bahrenburg observed Plaintiff

"communicating incorrect information to students" about income taxes; Bahrenburg explained

the error to Plaintiff, but Plaintiff did not, to Bahrenburg's knowledge, advise her students of the

correct information.  (*Id.*)  Bahrenburg reported this incident to Levinson.  (*Id.*)  Bahrenburg also

noted that though she had invited Plaintiff to observe her classes, Plaintiff never visited any of

Bahrenburg's classes.  (*Id.* ¶ 4.)[5]  Bahrenburg also did not believe that Plaintiff ever used any of

the lesson plans that she had provided to Plaintiff.  (*Id.*)

Levinson "regularly" heard complaints about disorder in Plaintiff's classroom from

teachers in the business department.  (Levinson Aff. ¶ 7.)  Plaintiff "was often late to class and

failed to notify [Levinson] when she was tardy in accordance with District policy."  (*Id.* ¶ 8.)

Levinson consulted with administrators regarding Plaintiff's job performance.  (*Id.* ¶ 12.)

### 6.  Plaintiff's Termination

In spring 2004, Stickney recommended to Casey that Plaintiff not be awarded tenure at

the end of her two-year probation.  (Casey Aff. ¶ 8.)  According to Casey, Stickney's reasons for

his recommendation were all "related to Plaintiff's performance, her lack of reliability, and the

fact that Plaintiff was not showing signs of improvement."  (*Id.*)  Casey reviewed Plaintiff's

evaluations, agreed with Stickney that Plaintiff's performance was deficient and was not

improving, and consequently recommended to the Board that Plaintiff not be offered tenure and

thus terminated at the end of the school year.  (*Id.* ¶¶ 8, 10.)  Casey informed Plaintiff of her

recommendation in a letter dated March 23, 2004.  (Casey Dep. 71-72.)  The Board adopted

---

[5] In response to Defendants' Rule 56.1 statement, Plaintiff asserted that "Mrs. Bahrenburg's Intro to Business classes were held while I was teaching a Class."  (Pl.'s Aff. ¶ 7.) During the arbitration proceeding, Plaintiff claimed that she did not "take [Levinson] up on [her] invitations" because "[t]he classes were not conducive to the hours."  (Arb. Tr. 28.)

Casey's recommendation at a meeting held on April 22, 2004.  (Casey Aff. ¶ 10; Conboy Aff.

Ex. F (Minutes of April 22, 2004 Board of Education Meeting 4).)

> 7.  Plaintiff's Union Grievance

On May 11, 2004, the Monticello Teachers' Association filed a grievance on Plaintiff's

behalf, contending in arbitration proceedings that Plaintiff "was entitled to receive a Teacher

Improvement Plan/Professional Assistance Program, because of acknowledged problems with

her performance," and that the District violated Plaintiff's rights under the applicable collective

bargaining agreement "by not providing such Plan or Program, and by not developing such a

Plan or Program in consultation with [Plaintiff]."  (Conboy Aff. Ex. D (Award of Martin F.

Scheinman, Esq., Arbitrator, Re: Termination of Elizabeth Woodard, dated Aug. 29, 2006 ("Arb.

Award"), 10, 13-14).)  Plaintiff testified in arbitration proceedings, and confirmed that as late as

the 2003-04 school year she was "still having issues . . . with the content of keyboarding and

intro to [occupations]."  (Arb. Tr. 31.)  In an August 2006 decision, an arbitrator denied the

grievance, finding that Plaintiff was properly provided with a Professional Assistance Program.

(Arb. Award 24.)

> B.  Procedural History

On March 24, 2004, Plaintiff filed a formal complaint of illegal discrimination with the

New York State Division of Human Rights, which was cross-filed with the Equal Employment

Opportunity Commission ("EEOC").  (AC ¶ 17.)  The EEOC issued Plaintiff a Notice of Right

to Sue dated August 23, 2006.  (*Id.* ¶ 20.)  Plaintiff commenced this action by a filing a pro se

complaint on November 20, 2006, which she amended, after obtaining counsel, on February 21,

2007.  Following Defendants' answer and the dismissal of Plaintiff's state law claims by Judge

McMahon, the case was reassigned to this Court on August 6, 2007.  Defendants' present motion

for summary judgment was submitted on November 2, 2007.  The Court held oral argument on

November 13, 2008.

## II.  Discussion

Plaintiff's Amended Complaint alleges that the District discriminated against her on the

basis of her race in violation of Title VII, and that Casey and the District discriminated against

her on the basis of her race in violation of 42 U.S.C. § 1981 ("Section 1981").[6]

### A.  Standard of Review

Summary judgment may be granted when it is shown that there is "no genuine issue as to

any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "When ruling on a

summary judgment motion, the district court must construe the facts in the light most favorable

to the non-moving party and must resolve all ambiguities and draw all reasonable inferences

against the movant."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

A party seeking summary judgment bears the burden of establishing that no genuine issue of

material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir.

2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is

sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential

element of the nonmovant's claim.  In that event, the nonmoving party must come forward with

---

[6] Plaintiff's Amended Complaint also asserts claims pursuant to 42 U.S.C. §§ 1983 and 1985, as well as Section 1981 claims against individual defendants other than Casey, all of which survived Defendants' motion to dismiss.  However, in briefing on the present motion, Plaintiff agreed to withdraw these claims (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") 16), and thus the Court will not consider them.

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations

omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do

more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote

omitted); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006)

("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

The Second Circuit has "repeatedly expressed the need for caution about granting

summary judgment to an employer in a discrimination case where . . . the merits turn on a

dispute as to the employer's intent."  *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir.

2008).  "Where an employer has acted with discriminatory intent, direct evidence of that intent

will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for

circumstantial proof which, if believed, would show discrimination.'" *Id.* (quoting *Gallo v.

Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994)).  "Even in the discrimination

context, however, a plaintiff must provide more than conclusory allegations to resist a motion for

summary judgment."  *Id.*; *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d

Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-

intensive context of discrimination cases. . . . [T]rial courts should not treat discrimination

differently from other ultimate questions of fact." (internal quotation marks omitted)).

B.  Title VII Discrimination Claim

The Court considers Plaintiff's Title VII claim of discrimination under the "burden-

shifting" framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973). *See Holcomb*, 521 F.3d at 138. "[T]he plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the plaintiff does so, the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action. If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802) (internal citations omitted).

### 1. Plaintiff's Prima Facie Case

A plaintiff satisfies her burden of establishing a prima facie case of employment discrimination if she introduces evidence that raises a reasonable inference that action taken by her employer was based on an impermissible factor. In particular, a plaintiff must show that: (1) she was a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Id.*; *see also Bryant v. Verizon Commc'ns, Inc.*, 550 F. Supp. 2d 513, 534 (S.D.N.Y. 2008).

For purposes of this motion, Defendants concede that Plaintiff can satisfy the first three prongs of the prima facie test. (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Summ. J. Mem.") 8.) Indeed, Plaintiff alleges discrimination on the basis of her race (AC ¶ 30); she possesses the basic qualifications to be a business teacher, as she had previously been tenured by another school district in New York (*id.* ¶ 22); and she identifies her termination as

an adverse employment action taken against her (*id.* ¶ 32).[7]  Defendants argue, however, that

Plaintiff has failed to meet her burden as to the fourth prong, because she has not demonstrated

that the circumstances surrounding her termination permit an inference of discriminatory intent.

(Defs.' Summ. J. Mem. 8-9.)

Plaintiff's burden in demonstrating the fourth prong of the prima facie test poses a "low

threshold, which the Supreme Court has described as 'minimal.'"  *Holcomb*, 521 F.3d at 139

(quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).  Plaintiff maintains that she

has met that threshold by virtue of several anecdotes and circumstances that she argues are

indicative of racial bias on the part of the District.  She alleges:

> (1) the prompt tearing down of African-American history month posters at
> MHS (a race awareness program sponsored by Plaintiff) by the Assistant
> principal Janine Carpenter, who was one of the two District employees
> responsible for evaluating Plaintiff;
> (2) during a meeting of District music teachers, one of the teachers
> directed a racial slur to Plaintiff;
> (3) the school year book published racially discriminatory animated
> pictures of teachers in African-American-face;
> (4) the racially discriminatory treatment of her daughter by a District
> employee, who denied Plaintiff's daughter the part in a community play
> because of her race;
> (5) the District being unsupportive of a racially cultural fashion show at
> MHS; . . .
> (6) the District denied Plaintiff's request to have one of her friends, a
> social worker and member of the NAACP, come to school to help children
> with the grieving process as a result of the suicide of an African-American
> student[;] . . .
> [(7)] the Defendants' undisputed employment statistics cited to by

---

[7] The Court notes that the statement in Plaintiff's Amended Complaint that the District
also discriminated against her "by denying her equal terms and conditions of employment" (AC
¶ 32) does not allege an adverse employment action separate from termination, as Plaintiff has
not pointed to any "objective indicia" that any action prior to her termination "created a
materially significant disadvantage in [her] working conditions," *Beyer v. County of Nassau*, 524
F.3d 160, 164 (2d Cir. 2008) (internal quotation marks omitted).

> Defendants that prove that Plaintiff was the only African-American
> teacher at MHS and one of six African-American teachers in the District
> of over 330 teachers; and
>
> [(8)] a review of the evaluations of white teachers granted tenure in
> comparison to Plaintiff, which evaluations were in part created by an
> individual accused of racial bias against African-Americans and the
> Plaintiff.  For example, reference is made to Plaintiff's evaluations . . . and
> the evaluations of Scott Fitchett, a white teacher granted tenure . . . .

(Pl.'s Mem. 3-5 (internal citations and footnote omitted).)

The Court finds that the eighth item identified by Plaintiff is sufficient to establish the requisite minimal inference of discrimination.  "A showing of disparate treatment — that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' — is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case."  *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).  "A plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'"  *Id.* (quoting *Graham*, 230 F.3d at 39).  "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury."  *Id.*  A reasonable jury could find that Plaintiff and Scott Fitchett, a white physical education teacher who was granted tenure by the District, were similarly situated.  Both were probationary teachers at MHS, both were considered for tenure by Casey, and both received some evaluations that suggested deficiencies in their job performance. For instance, both Plaintiff and Fitchett were criticized for inadequately concluding lessons and activities with summaries, enforcing class rules, and managing class time.  (Bonnist Aff. Ex. 4 (Oct. 31, 2001 Evaluation, Feb. 7, 2002 Evaluation, Mar. 21, 2002 Evaluation, Sept. 20, 2002 Evaluation, Personnel File of Scott Fitchett).)  Defendants suggest that Plaintiff cannot be

16

similarly situated to Fitchett because they were evaluated by different administrators, because Casey did not actually review Fitchett's evaluations (as her practice was to review the evaluations only of teachers recommended for termination by their supervisors), and because "Fitchett's evaluations improved over time whereas Plaintiff's did not."  (Defs.' Reply Mem. of Law in Supp. of Defs.' Mot. for Summ. J. 8.)  However, Fitchett received a very critical evaluation as late as his final year as a probationary teacher (Bonnist Aff. Ex. 4 (Sept. 24, 2003 Evaluation, Personnel File of Scott Fitchett)), and Plaintiff's 2003-04 year-end evaluation implied that she did achieve adequate progress in one of her three "Performance Objectives" (*id.* Ex. 3 (Mar. 22, 2004 Summative Evaluation, Pl.'s Personnel File)).  Moreover, a jury might conclude that the deficiencies reflected in Fitchett's earlier evaluations were more severe than those in Plaintiff's evaluations.  Accordingly, the Court cannot conclude as a matter of law that Plaintiff and Fitchett were not similarly situated, and therefore finds that Plaintiff has satisfied the fourth prong and established a prima facie case of discrimination.[8]

### 2.  Defendants' Nondiscriminatory Justification for Terminating Plaintiff

Because Plaintiff's prima facie case creates a presumption of discrimination, Defendants have the burden of articulating a legitimate, nondiscriminatory reason for terminating Plaintiff.

---

[8] Defendants' argument that "Evidence of Contrasting Job Performance Evaluations[] Cannot, as a Matter of Law, Create an Inference of Discrimination" (Defs.' Summ. J. Mem. 12) is mistaken.  In *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93 (2d Cir. 2001), the case cited by Defendants for that proposition, the Second Circuit concluded that the plaintiff, who was "eminently qualified" for a position that was awarded to "an applicant substantially younger," *did* establish circumstances giving rise to an inference of age discrimination and "easily made out a prima facie case," *id.* at 102.  The critical issue in *Byrnie* was whether, at the *final* step of the *McDonnell Douglas* analysis, the disparity in qualifications between the plaintiff and the other applicant was significant enough to create a material issue of fact as to whether the defendant discriminated against the plaintiff.  *See id.* at 103.

This Defendants have done, as they have established that Stickney recommended Plaintiff's termination to Casey because of Plaintiff's continued deficient teaching performance, and that Casey recommended Plaintiff's termination to the Board for the same reason.  (Defs.' Rule 56.1 ¶¶ 19, 35-36, 44.)  This explanation for Plaintiff's termination is amply supported by, *inter alia*, Plaintiff's evaluations and the affidavits of Casey, Bahrenburg, and Levinson.

### 3.  Plaintiff's Proffer of Evidence Supporting a Finding of Discrimination

As Defendants have met their burden of production and proffered a nondiscriminatory reason for Plaintiff's termination, Plaintiff's claim can survive summary judgment only if she "has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire [her] was based, at least in part, on the fact that [she] was black," *Holcomb*, 521 F.3d at 141.  The Court concludes that Plaintiff has not done so.

In her attempt to rebut Defendants' race-neutral explanation for Plaintiff's termination, Plaintiff offers the same eight allegations that she cited as supporting her prima facie case.  (Pl.'s Mem. 13-14.)  These allegations, even when considered in their totality, are insufficient to carry Plaintiff's burden.

First, Plaintiff alleges that Carpenter "prompt[ly] t[ore] down" posters that were part of a Black History Month display.  (*Id.* 3, 13.)  Plaintiff stated in her deposition that she put up a display for Black History Month, and that although "it was the first time they had ever had any display like this in the whole school," Carpenter "never once said it was great" or "thank you, a great display," and "[n]either did the principal."  (Conboy Aff. Ex. G (Deposition of Elizabeth Woodard ("Woodard Dep.") 71).)  Plaintiff further claimed that on "the day after the end of Black History Month," Carpenter "was pulling [the posters] down off the wall and then she told

18

me to finish taking them down." (*Id.* 70.)  Plaintiff added:  "I was very upset about that.  I was hurt by the action she took.  It just seemed to me to be so negative." (*Id.*)  Plaintiff does not offer any evidence — at least, aside from her own subjective feeling of being "upset" — that there was anything unusual or improper about Carpenter's actions with regard to Plaintiff's Black History Month display, particularly in taking down the posters *after* the month ended, and she does not allege that Stickney was even aware of the display.  In particular, she has produced no evidence of District policies or practices regarding such displays, nor has she deposed Carpenter, Stickney, or any other individual who was aware of the display to determine if Carpenter acted differently with regard to other displays.  Moreover, other than insinuating that Carpenter's reaction to the Black History Month display reflected racism, which in turn allegedly infected Carpenter's evaluations of Plaintiff, Plaintiff does not allege any connection between the display and the decision to terminate her employment.  In fact, Casey, the District official who made the decision to terminate Plaintiff, testified that she did not recall Plaintiff raising awareness of Black History Month, stating, "That may have been something that occurred within the school that I was not directly involved with."  (Casey Dep. 61.)  Thus, Plaintiff's speculation that Carpenter had a "negative" attitude toward her Black History Month display, without more, cannot help Plaintiff create a material question of fact.  *See, e.g.*, *Bickerstaff v. Vassar College*, 196 F.3d 435, 450-51 (2d Cir. 1999) (affirming summary judgment in case of African-American female professor denied tenure despite plaintiff's accusation that an individual involved in the promotion process was "oppos[ed] to the introduction of a new Africana Studies course he was charged with reviewing" and that he "consistently objected to an attentiveness to race, to discussing it, to students['] arguments of a need to combat racism").

19

Second, Plaintiff alleges that a District music teacher "directed a racial slur to Plaintiff." (Pl.'s Mem. 3, 14.)  Putting aside the issue of this allegation's probative import, Plaintiff has adduced no admissible evidence of this slur.[9]  According to Plaintiff, at a District music department meeting that may or may not have occurred while Plaintiff was employed by the District, an unidentified music teacher made an unspecified racial slur that was "specifically directed at" Plaintiff and was "relevant to the use of the N word within the slur."  (Woodard Dep. 79-82.)  Plaintiff was not at the meeting where the slur allegedly was made; she claims that an unnamed former District teacher told her about the incident.  (*Id.* 79.)  Plaintiff did not depose the former teacher, or any individual who was at the meeting, nor does Plaintiff indicate the basis for the former teacher's knowledge of what transpired at the meeting.  In sum, the only evidence Plaintiff has produced relating to this allegation is, at best, double hearsay, and cannot help Plaintiff avoid summary judgment.  *See* Fed. R. Civ. P. 56(e)(1) (requiring affidavits opposing summary judgment to "set out facts that would be admissible in evidence"); *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) (noting that "inadmissible hearsay . . . [is] an insufficient basis for opposing a motion for summary judgment").

Third, Plaintiff alleges that "the school yearbook published racially discriminatory animated pictures of teachers in African-American-face."  (Pl.'s Mem. 3, 14.)  Specifically, Plaintiff stated in her deposition:

> They put cartoon characters of absent teachers and those cartoon characters were of people of color, dark complexion, woman, dark hair in the place of white

---

[9] Here, it cannot be disputed that a single statement by a coworker not named as a defendant is not evidence of discrimination by Defendants, particularly when there is no allegation, let alone evidence, that Defendants were aware of this alleged comment or that, if they were aware of it, they failed to confront the unnamed employee about the comment.

teachers who were absent. . . .

Being I was the only black teacher in the high school, it reflected on me being a minority teacher, and seeing those minority cartoon characters all through the yearbook, I thought it was very insensitive and racially hurting to me.

(Woodard Dep. 116.)  Plaintiff did not produce as evidence a copy of the yearbook, any of its contents, or any further description of the cartoon characters; she did not offer any evidence that Casey (or any other District official) had knowledge of the contents of the yearbook; and she did not depose any witness with respect to the contents of the yearbook.  In fact, Plaintiff did not recall making any complaint about the yearbook while she was employed by the District.  (*Id.* 118.)  Moreover, Plaintiff has not explained why she believes there is a connection between cartoon characters in the yearbook and Casey's decision to recommend that Plaintiff be denied tenure, particularly because Plaintiff has offered no evidence as to who was responsible for the cartoons.  Plaintiff's own vague description of the cartoons and assertion that the cartoons were "racially hurting to me" (*id.* 116) — the only evidence adduced by Plaintiff as to the cartoons — could not lead a reasonable jury to conclude that Plaintiff's termination was racially discriminatory.  *Cf. Bickerstaff*, 196 F.3d at 456 (plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination" (internal quotation marks and brackets omitted)).

Fourth, Plaintiff alleges that her daughter was denied a role in a *community* play because of her race several years before Plaintiff became a teacher in the District, and that the person who denied her the role was a District employee.  (Pl.'s Mem. 3, 14.)  Plaintiff wrote Casey a letter, dated June 14, 1999, stating that "[her] children [were] denied a part in the Sullivan County Dramatic Workshop because of their color," and that "one of your employees, Ms[.]

21

Orstano-James, was also involved." (Woodard Letter, dated June 14, 1999, Attach. to Pl.'s Aff.)

The letter stated that Plaintiff informed Casey of this incident at a May 1999 meeting, and

referred to Orstano-James as "an educator in upper management." (*Id.*) Plaintiff stated in her

deposition that Orstano-James was an assistant principal and that she told Plaintiff's daughter,

"Arlisa, you are excellent, but if it wasn't for your color you could have the lead role in the

show." (Woodard Dep. 34.) Casey testified in her deposition that she received Plaintiff's letter,

and that "[i]n response to the letter" she "met with the director of music to determine how

selections were made for school performances, just to assure ourselves that this person did not

have sole jurisdiction over making those decisions." (Casey Dep. 12.) Casey stated that the

Sullivan County Dramatic Workshop, as a "community drama workshop," was "totally separate

from the school district" and "not under my jurisdiction." (*Id.* 11.) Plaintiff does not dispute this

fact. Nor has she offered any other evidence that her daughter was in fact denied a role due to

her race, or that Casey's response to her letter was inadequate. Furthermore, considering that the

incident transpired in 1999, that Casey recommended that Plaintiff be *hired* in 2002, and that

Plaintiff does not allege that Orstano-James was involved in any way in the decision to terminate

Plaintiff in 2004, no reasonable jury could conclude that the allegation constitutes evidence of

discriminatory termination of Plaintiff.

Fifth, Plaintiff alleges that "the District [was] unsupportive of a racially cultural [*sic*]

fashion show" that she organized. (Pl.'s Mem. 4, 14.) According to Plaintiff, the school granted

her request to "take a bus of kids shopping," but "would not give me a credit card or something

to keep the clothing on layaway, so I used my own credit card." (Woodard Dep. 72.) Casey

stated in her deposition that she heard that there was a fashion show but did not recall anything

else about it.  (Casey Dep. 61.)  Plaintiff presents no evidence regarding who denied her request

for a credit card to put clothing on layaway, whether such a request was of the sort that would

normally be granted by the District, or what about the denial of her request was suggestive of

racial discrimination.  The only evidence before the Court regarding the fashion show — aside

from Plaintiff's conclusory statement that the District was "unsupportive" — is that both

Plaintiff's 2002-03 and 2003-04 year-end evaluations commended Plaintiff for her efforts with

respect to the fashion show.  Given this undisputed record, Plaintiff cannot rely on this claim to

defeat summary judgment.

Sixth, Plaintiff alleges that "the District denied Plaintiff's request to have one of her

friends, a social worker and member of the NAACP, come to school to help children with the

grieving process as a result of the suicide of an African-American student." (Pl.'s Mem. 4, 14.)

According to Plaintiff's deposition testimony, however, Plaintiff's friend, an African-American

woman and "a retired mental health person," made the offer herself, and no District employee

ever actually spoke to Plaintiff regarding her friend's offer.  (Woodard Dep. 78-79.)  Plaintiff

stated:  "She called and they told her no, we don't need you."  (*Id.* 78.)  Plaintiff does not

identify the friend or the District official or officials with whom the friend allegedly spoke, and

she did not depose any person with regard to this incident.  Moreover, Plaintiff offers no

evidence regarding her friend's qualifications as a social worker, the District's policies with

respect to volunteer mental-health assistance in the aftermath of suicides, the race of any

volunteers who may have come to the school in that or any other case, the District's past

responses when other students have committed suicide, or whether the District knew that the

volunteer was African-American (or that she was Plaintiff's friend) when her offer was rejected.

23

Thus, this claim offers inadequate reason to deny summary judgment.

Seventh, Plaintiff alleges that during her employment with the District she was the only African-American teacher at MHS and one of six African-American teachers in the District. (Pl.'s Mem. 4, 14.)  Defendants do not dispute these statistics, or the fact that 21 percent of the District's students are African-American (*id.* 2), and the Court assumes for the purposes of this motion that they are accurate.  However, they are plainly irrelevant to Plaintiff's claim of discriminatory *firing*.  Such statistics might be suggestive of discriminatory treatment of African-Americans in the District's *hiring* process, but Plaintiff has no discrimination claim with respect to her hiring, as she was indeed hired by the District in 2002 with Casey's knowledge that she was African-American.[10]  Perhaps the statistics could support some inference of discriminatory termination if the low number of African-American teachers reflected a disproportionately high number of African-American probationary teachers being denied tenure, but Plaintiff does not make any such allegation.  Instead, Plaintiff merely asserts that of the few African-American teachers hired, "even fewer were advancing to tenure" (*id.* 6) — a statement obviously true if even a single African-American teacher was denied tenure — and that two of the six African-American teachers employed by the District during Plaintiff's employment (including Plaintiff) were not offered tenure by the District (*id.* 7), without making any allegation that this was an unusually low rate of success compared to that enjoyed by teachers of other races.  Moreover, it

_____

[10] It is undisputed that, during Casey's tenure as superintendent for the District, "a concerted effort was made to include African-American teachers in the pool of candidates the District selected from." (Casey Aff. ¶ 11.)  Casey "personally worked with the NAACP in an effort to recruit African American and minority candidates," and advertised in a New York City-area newspaper "directed at a minority readership." (*Id.*)  Several African-American applicants declined offers of employment or offers to interview for positions, often citing, *inter alia*, the relatively low pay offered by the District in comparison to other districts in the area.  (*Id.*)

is undisputed that during Plaintiff's probationary term Casey recommended four African-American teachers for tenure and advised seven white teachers that she was not recommending them for tenure.  (Casey Aff. ¶ 12.)  Thus, Plaintiff's statistical analysis does not justify denial of summary judgment.

Finally, Plaintiff alleges that "the evaluations of white teachers granted tenure in comparison to Plaintiff, which evaluations were in part created by an individual accused of racial bias against African-Americans and the Plaintiff" (*id.* 4, 14), "help demonstrate that she was denied tenure due to her race" (*id.* 12).  Plaintiff asserts that the fact that "her evaluations were as good as, and in some instances significantly better than, other white employees granted tenure" allows her to "rebut Defendants' proffered legitimate business reason for denial of tenure."  (*Id.* 13.)  While, as discussed above, the evidence supporting this allegation may be sufficient to establish a prima facie case of discrimination, it is inadequate to establish a material issue of fact as to the ultimate question of whether the District intentionally discriminated against Plaintiff.

Plaintiff refers primarily to the personnel file of Scott Fitchett, a white physical education teacher who was granted tenure by the District at the end of the 2003-04 school year.  Like Plaintiff, Fitchett was initially regarded as an inadequate teacher.  However, unlike Plaintiff, Fitchett received positive evaluations in the final months prior to the District's tenure decision.  For example, an evaluation of Fitchett's gym class in January 2004 stated that Fitchett had "a well organized lesson plan," that he "did a fine job of modeling and explaining skills as well as providing corrective feedback during skill practice," and that his "[t]ime management and class organization allowed students to get ample practice."  (Bonnist Aff. Ex. 4 (Jan. 9, 2004

Evaluation, Personnel File of Scott Fitchett).)  The only suggestions for improvement given by

Fitchett's evaluator were that his lesson "could be more effective" if he made the volleyball

court "narrower and longer" and if he had the students "practice spiking with a lower barrier."

(*Id.*)  Fitchett's year-end evaluation stated that he "completed his goals for the year" with respect

to preparing specific and appropriate lesson plans, evaluating students' performance, focusing

students on goals, and maintaining good communication with students and parents.  (*Id.* (June

15, 2004 Summative Evaluation, Personnel File of Scott Fitchett).)  The only criticism made of

Fitchett in that evaluation was that he "sometimes assumes a role more of a monitor/observer

rather than that of a teacher/coach."  (*Id.*)  Casey, who did not contemporaneously review

Fitchett's evaluations — because Fitchett was recommended for tenure — stated in her

deposition that "what Mr. Fitchett's file reflects is an example of a teacher who had deficiencies

as he began teaching and who addressed them as he went on through his process."  (Casey Dep.

111-12.)  By contrast, it is undisputed that Plaintiff continued to receive strongly negative

evaluations throughout her two years of probationary employment, and that Plaintiff's final year-

end evaluation concluded that she had not achieved adequate progress in multiple areas.  Thus,

the fact that a white teacher with Fitchett's improved evaluations was offered tenure while a

teacher with Plaintiff's consistently negative evaluations was not offered tenure would not

enable a reasonable jury to find that the District discriminated against Plaintiff based on her

race.[11]

---

[11] Plaintiff contends that a jury could infer racial discrimination from the fact that other
District teachers denied tenure during Plaintiff's employment received year-end evaluations
explicitly stating that their performance was "unsatisfactory" or "not . . . satisfactory," whereas
Plaintiff's year-end evaluations contained no such language.  This argument, advanced by
Plaintiff for the first time at oral argument, is meritless.  None of the other cited evaluations was

Plaintiff makes an additional argument that a jury might find the evaluations themselves unreliable, because some of Plaintiff's evaluations were performed by Carpenter, who Plaintiff alleges was biased against African-Americans. This argument is unavailing. Plaintiff's only evidence of Carpenter's racial bias — aside from Plaintiff's subjective perception that Carpenter had a negative attitude toward a Black History Month display — is the content of the evaluations themselves. Plaintiff offers no evidence, other than her own opinion that she was a good teacher, that any comments made in her evaluations were inaccurate or unfair. *See ITC Ltd. v. Punchgini, Inc.*, 518 F.3d 159, 163 (2d Cir. 2008) ("Conjecture, of course, is insufficient to withstand summary judgment."). Moreover, the final two evaluations of Plaintiff — an evaluation of her March 18, 2004 Introduction to Occupations class, and her 2003-04 year-end evaluation — were performed not by Carpenter but by Stickney, against whom Plaintiff makes no allegations of racial prejudice. Considering that the critical observations contained in Carpenter and Stickney's evaluations of Plaintiff are supported by the affidavits of two of Plaintiff's former colleagues, and that Plaintiff offers no evidence of her teaching abilities other than her own opinions, Plaintiff has not created a genuine issue of material fact as to the reliability of her evaluations.

### 4.  Same Actor Inference

The Court notes briefly that the conclusion above — that Plaintiff has failed to establish a

---

done by Carpenter or Stickney, the supervisors who evaluated Plaintiff; Plaintiff offered no evidence that "satisfactory" is a magic word with some special significance within the District; and Plaintiff's own 2003-04 year-end evaluation stated that her progress had not been "adequate" — certainly a synonym for "satisfactory." Moreover, of the teachers who were not offered tenure, Cathy Stawarz, a white teacher, received a year-end evaluation that did not use the words "not satisfactory" or "unsatisfactory" to describe her performance, and Derek Ragland, an African-American teacher, *did* receive a year-end evaluation stating that "his performance . . . has not been satisfactory." (Bonnist Aff. Ex. 5 (Statistics Regarding District Employment of Teachers); *id.* Ex. 6 (Summative Evaluation Pages From Teachers Denied Tenure).)

genuine issue of material fact as to whether she was terminated due to race discrimination — is strongly supported by the fact that Plaintiff's hiring and firing were recommended by the same individual within a relatively short time span.  The Second Circuit has observed, in the context of age discrimination claims, that "when the person who made the decision to fire was the same person who made the decision to hire, especially when the firing occurred only a short time after the hiring, it is difficult to impute to him an invidious firing motivation that would be inconsistent with his decision to hire."  *Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir. 2003). The Second Circuit has applied this rationale in affirming a grant of summary judgment when there was a three-year gap between hiring and firing.  *See Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000).  District courts within the Second Circuit have applied this rationale to Title VII claims.  *See, e.g.*, *Jaiyeola v. Carrier Corp.*, 562 F. Supp. 2d 384, 389 (N.D.N.Y. 2008) (granting summary judgment because plaintiff failed to establish prima facie case of discrimination, in part due to fact that same individual both hired and fired plaintiff); *Ford v. New York City Dep't of Health & Mental Hygiene*, 545 F. Supp. 2d 377, 390 (S.D.N.Y. 2008) (same); *cf. Garcia v. Henry Street Settlement*, 501 F. Supp. 2d 531, 541 (S.D.N.Y. 2007) (granting summary judgment because plaintiff failed to establish prima facie case, and holding that even if she did so she failed to defeat summary judgment at the final step of the *McDonnell Douglas* test in part because the same individual both promoted and fired plaintiff).  The "same actor" inference is clearly applicable in this case.  In 2002, Casey — knowing that Plaintiff was African-American — recommended to the District that Plaintiff be hired, and less than two years later she recommended to the District that Plaintiff be terminated.  (Moreover, in both cases Casey was acting on the recommendation of Stickney, though there is no specific evidence as to

28

whether Stickney was aware of Plaintiff's race at the time that he made his recommendation that

Plaintiff be hired.)  Plaintiff does not rebut this inference other than to allege that an additional

individual, Carpenter, had "input" into the decision to recommend Plaintiff's termination but was

not involved in the decision to hire her (Pl.'s Mem. 6), but she presents no evidence that

Carpenter was involved in discussions regarding whether Plaintiff should be offered tenure or

that Carpenter in fact recommended to Casey that Plaintiff not be offered tenure.

C.  Section 1981 Claim

Plaintiff's Amended Complaint alleges that Casey and the District "intentionally

discriminated against plaintiff in violation of the 14th Amendment to the Constitution as

protected by Section[] 1981 . . . by denying her equal terms and conditions of her employment,

and by terminating her employment, all in deprivation of her rights secured by the Constitution

and Federal Law."  (AC ¶ 35.)

Section 1981 "protects the equal right of '[a]ll persons within the jurisdiction of the

United States' to 'make and enforce contracts' without respect to race."  *Domino's Pizza, Inc. v.

McDonald*, 546 U.S. 470, 474 (2006) (quoting 42 U.S.C. § 1981(a)).  "[D]iscriminatory intent is

a necessary element of a § 1981 claim."  *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 368

(S.D.N.Y. 2006).  "Thus, a failure to establish sufficient evidence of discriminatory intent to

survive summary judgment on a Title VII claim is fatal to a similar claim of racial discrimination

under § 1981."  *Id.*; *see also Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir.

2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in

violation of Title VII are also applicable to claims of discrimination in employment in violation

of § 1981 . . . , and the factors justifying summary judgment dismissing [a plaintiff's] Title VII

29

claim . . . for termination of his employment equally support the summary dismissal of his claims for termination brought under . . . § 1981.").

Because Plaintiff has failed to establish a genuine issue of material fact as to her claim of intentional race discrimination in violation of Title VII, and because her Section 1981 claim is based on the same facts as her Title VII claim,[12] Defendants are also entitled to summary judgment on Plaintiff's Section 1981 claim.

### III.  Conclusion

For the reasons stated herein, Defendants' Motion for Summary Judgment is granted. The Clerk of Court is respectfully directed to terminate the motion (Dkt. No. 37), to enter judgment for Defendants, and to close this case.

SO ORDERED.

Dated:  December 1, 2008
    White Plains, New York

           KENNETH M. KARAS
           UNITED STATES DISTRICT JUDGE

---

[12] Plaintiff argues that there is "an independent factual basis for her § 1981 claim" because she had "a contractual right to a non-discriminatory hearing under her collective bargaining agreement," which was breached in violation of Section 1981 when, during the arbitration that followed Defendant's termination, the District "put forth evidence in the form of her evaluations she received in the tenure review process," evidence that "she claims is discriminatory." (Pl.'s Mem. 15.)  In other words, Plaintiff argues that because her evaluations were a product of racial discrimination, the District racially discriminated against her by offering those evaluations as evidence in an arbitration proceeding.  Putting aside the questions of whether the Court should consider this tardy argument, which is not suggested in Plaintiff's Amended Complaint, and whether Plaintiff has standing to sue under Section 1981 (because the contractual right arguably belonged to the union), it is plain that Plaintiff's argument ultimately relies on the existence of a genuine issue of material fact as to whether Plaintiff's evaluations were in fact discriminatory, which, as discussed above, Plaintiff has not established.

30

Service List (by ECF):

Craig M. Bonnist, Esq.
Bonnist & Cutro, LLP
800 Westchester Avenue, Suite S-332
Rye Brook, NY  10573
cbonnist@bcfirm.com

Gregg Tyler Johnson, Esq.
Girvin & Ferlazzo, P.C.
20 Corporate Woods Blvd.
Albany, NY  12211
gtj@girvinlaw.com

Jacinda Hall Conboy, Esq.
Girvin & Ferlazzo, P.C.
20 Corporate Woods Blvd.
Albany, NY  12211
jhc@girvinlaw.com